UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-md-02246-KAM

IN RE: AIR CRASH NEAR RIO GRANDE
PUERTO RICO ON DECEMBER 3, 2008

THIS DOCUMENT RELATES TO:

CASE NO. 10-cv-81551
CASE NO. 11-cv-80059
_____/

**OPINION AND ORDER**

This cause is before the Court upon Ramo, LLC's Motion to Dismiss First Amended Complaint (DE 150) and Ramo, LLC's Motion to Dismiss Count I and II and/or Strike All Alter Ego and Mere Instrumentality Allegations from the Second Amended Complaint (DE 186). The Court has carefully considered the motions and is otherwise fully advised in the premises.

I. Background

A. First Amended Complaint of J. Donald Cairns, as Personal Representative of the Estate of Tracy Turner and Chris Turner

Plaintiff J. Donald Cairns, as personal representative of the Estate of Tracy Turner and Chris Turner, (the "Turner Plaintiffs") brings this First Amended Complaint ("FAC") against Defendants Websta's Aviation Services, Inc., ("Websta"), Ramo, LLC ("Ramo"), Warren Mosler ("Mosler") and Rainbow International Airlines, Inc. ("Rainbow") (collectively, "Defendants") asserting one claim pursuant to the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, ICAO Doc. 9740, reprinted in Treaty Doc. No. 106–45, 1999 WL 33292734 (2000), ("Montreal Convention") (count one) and one claim for vicarious liability against Ramo, Mosler and Rainbow (count two). (FAC, DE 128.)

According to the FAC, Tracy Turner was a passenger aboard a chartered flight operated by Defendants and piloted by Websta's president. The aircraft crashed into a mountain near Rio Grande, Puerto Rico while en route from Terrance B. Lettersome International Airport in Tortola, British V.I. to Luis Munoz Marin International Airport in San Juan, Puerto Rico. As a result of the crash, Ms. Turner, co-plaintiff Kent W. Clapp and the pilot were all killed. (FAC ¶¶ 21-22.)

Mosler was and is the owner, officer and/or director of Ramo. (FAC ¶ 10.) Rainbow conducts regular commercial flights in and out of Miami and Fort Lauderdale Florida. (FAC ¶ 11.) Websta was a common carrier engaged in the business of transporting fare-paying passengers and crew members to destinations in the Caribbean and international flights in aircraft owned, leased, operated, managed, maintained and/or controlled by Websta, Ramo, Mosler or Rainbow's agents and/or employees. (FAC ¶ 12.) At the time of the accident, Websta's international flights were operated by Rainbow. (FAC ¶ 14.) Ramo maintained "actual immediate control over Websta's assets and operations, such that Websta was nothing more than a mere instrumentality of Ramo in that Ramo had effective ownership of most of Websta's assets and paid most expenses related to its ownership, maintenance and operations." Ramo divested Websta of its assets following the events in this action and rendered Websta incapable of satisfying any judgment. (FAC ¶ 15.) Mosler was the sole owner and controlling officer of Ramo, such that Ramo is a mere instrumentality used by Mosler for his personal purposes and is not distinguishable from Mosler. It is further asserted that Mosler has used Ramo to divest Websta of its assets. (FAC ¶ 16.) Ramo and Mosler were the alter ego of Websta in that Mosler, acting through Ramo, acted as a general partner, principal or joint venturer of Websta and maintained control over substantially all of Websta's assets, day-to day fiscal policies and

operations. (FAC ¶ 18.) Ramo, Mosler and/or Rainbow was the owner of the accident aircraft, the constructive owner of the accident aircraft and/or exercised complete control and dominion over the operation, equipping and maintenance of the accident aircraft. (FAC ¶ 19.) Rainbow was the operator of the aircraft through its alter ego, Websta. (FAC ¶ 20.) For purposes of the Montreal Convention, Ramo, Mosler and/or Rainbow were actual or contracting carriers either in the name of Websta or through their actual control of Websta. (FAC ¶ 26.) By contract, Websta, Ramo, Mosler and/or Ramo agreed to provide international air transport. (FAC ¶ 24.) In addition, Websta was a mere agent, instrumentality and/or alter ego of Ramo, Mosler and Rainbow. (FAC ¶ 35.)

      B.  <u>Second Amended Complaint of Plaintiffs Alexander Kent Clapp and Jason Clapp</u>

Plaintiffs Alexander Kent Clapp and Jason Clapp, as co-personal representatives of the Estate of Kent W. Clapp (the "Clapp Plaintiffs"), bring this Second Amended Complaint ("SAC") against Defendants asserting one claim pursuant to the Montreal Convention (count one) and one claim for vicarious liability against Ramo, Mosler and Rainbow (count two). (SAC, DE 173.)

According to the SAC, on or about December 3, 2008, Kent Clapp was a passenger aboard a chartered flight operated by Defendants and piloted by Websta's president. The aircraft crashed into a mountain near Rio Grande, Puerto Rico while en route from Terrance B. Lettersome International Airport in Tortola, British V.I. to Luis Munoz Marin International Airport in San Juan, Puerto Rico. As a result of the crash, Mr. Clapp, co-plaintiff Tracy Turner and the pilot were all killed. (SAC ¶¶ 21-22.)

On December 18, 2008, Websta transferred ownership of various aircraft to Ramo as well

as other assets. (SAC ¶ 23.) Websta is a carrier subject to the Montreal Convention and Ramo, Mosler and/or Rainbow are either actual and/or contracting carriers, either under the name of Websta or through their actual control. (SAC ¶ ¶ 35-36.)  By contract, Websta agreed to provide international transport. (SAC ¶ 34,)  At the time of the accident, Websta's flights were operated and/or controlled by Ramo, Mosler and Rainbow.  For example, Ramo and Mosler maintained actual immediate control over Websta's assets and operations such that Websta was "nothing more than a mere instrumentality" of Ramo and Mosler. The operations of both Ramo and Websta were in no way distinguishable from Mosler. (SAC ¶ 43.)  Websta is a mere agent, instrumentality and/or alter ego of Ramo, Mosler and/or Rainbow. (SAC ¶ 44.)  Mosler, acting in both his own name and under the corporate name of Ramo, acted as a general partner, principal or joint venturer of Websta. (SAC ¶ 19.)

  Ramo moves to dismiss both complaints.  Specifically, Ramo argues that the complaints fail to allege a claim against Ramo as the actual or contracting carrier under the Montreal Convention.  Ramo asserts that the claim against it is deficient because Websta performed the carriage of passengers and baggage and there are no allegations that Ms. Turner or Mr. Clapp entered into a contract for carriage with Ramo, who, in turn, made a contract with Websta.  Ramo also argues that the Montreal Convention does not permit alter ego liability. Ramo states that the factual allegations that Ramo acted as a general partner, principal or joint venturer of Websta are conclusory. Additionally, Ramo contends it cannot be held liable under an alter ego theory because there are no allegations that it has a controlling ownership interest in Websta. Even if an alter ego theory can be brought, Ramo states that Plaintiffs have failed to plead allegations sufficient to pierce Websta or Ramo's corporate veil.  Ramo also contends that the complaints do

not allege that Ramo's formation or use of Websta was for an improper purpose. Finally, Ramo moves to strike count two.

In response, Plaintiffs contend that it is proper to allege that Ramo and Websta may both be actual and contracting carriers under the Montreal Convention and the Montreal Convention permits alter ego liability. Plaintiffs also contend that they have alleged sufficient facts to support Ramo's alter ego liability and they are not required to allege that Ramo is a stockholder in Websta in order to pierce the corporate veil.

## II. Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed. R. Civ. P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950. When considering a motion

to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

### III.  Discussion

Assuming, without deciding, that Plaintiffs can bring a claim pursuant to the Montreal Convention under an alter ego theory of liability, the Court will address whether the complaints properly allege claims under that theory.  The parties disagree over whether Florida or Virgin Islands law applies.  The Court need not decide this question because under either jurisdiction's law Plaintiffs have not properly alleged alter ego liability.

As recently as 2011, the United States Court of Appeals for the Eleventh Circuit discussed the requirements under Florida law to allow a plaintiff to disregard the corporate form and hold a person involved with the operation of a corporation liable under the veil piercing theory. See Molinos Valle Cibao v. Lama, 633 F.3d 1330, 1349 (11th Cir. 2011).  The court in Molinas ruled that the Florida Supreme Court would "not permit a plaintiff to pierce the corporate veil against a non-shareholder director." Id. at 1351.  In so ruling, the Molinos court rejected the contention that decisions of Florida's intermediate appellate courts[1] authorize the imposition of such liability against non-shareholders generally, and recognized a limited exception for situations where a spousal relationship exists between the corporate officer against whom veil piercing liability is being sought and the shareholder of the corporation.  Thus, the

---

[1] See, e.g., Walton v. Tomax Corp., 632 So.2d 178 (Fla. Dist. Ct .App. 1994)(defendant was the president and chief executive officer of the corporate entity and the husband of the sole shareholder); Bermil Corp. v. Sawyer, 353 So.2d 579 (Fla. Dist. Ct. App. 1978)(defendant was a corporate officer of the corporation and the husband of the sole shareholder).

court stated that "it is black letter law in Florida" that a party seeking to pierce the corporate veil must prove that:

> (1) the <u>shareholder dominated and controlled the corporation</u> to such an extent that the corporation's independent existence, was in fact non-existent and <u>the shareholders were in fact alter egos of the corporation</u>;
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

Id. at 1349 (emphasis added).

It appears to be undisputed that Ramo is not a shareholder of Websta. Nevertheless, Plaintiffs contend that <u>Molinos</u> is not controlling. For this proposition, they rely upon <u>NetJets Aviation, Inc. v. Peter Sleiman Dev. Group, LLC</u>, No. 3:10-cv-483-J-32MCR, 2011 U.S. Dist. LEXIS 114081 (M.D. Fla. June 13, 2011), <u>aff'd</u> 2011 U.S. Dist. LEXIS 109973 (M.D. Fla. Sept. 27, 2011) ("NetJets II"). That court attempted to distinguish and limit the reach of <u>Molinas</u> and ultimately decided not to dismiss a claim seeking to pierce the corporate veil against a non-shareholder at the pleading stage. In reaching that decision, the Magistrate Judge, in his Report and Recommendation to the District Judge, reasoned that the holding of <u>Molinas</u> "is limited to cases with similar facts: where the only evidence of domination and control by the defendant is that the defendant is a director of the corporation." 2011 U.S. Dist. LEXIS 114081 at * 16.

This Court rejects NetJets II's conclusion regarding the limited reach of <u>Molinas</u>. The question presented to the court in <u>Molinas</u> was not whether being a director of a corporation, without more, is sufficient to render a person liable under a veil piercing theory of liability. That conclusion can be discerned from the court's restatement of the "black letter law in Florida" of what a plaintiff must prove to pierce the corporate veil, namely, that the person alleged to be the alter ego "dominated and controlled the corporation to such an extent that the corporation's

7

independent existence, was in fact non-existent and the [person being sued was] in fact [the] alter ego[] of the corporation." Molinas, 633 F.3d at 1349. If the court was limiting its ruling to cases where the only evidence of domination and control of the corporation was being a director, the court would have simply concluded that holding that position, without more, does not satisfy the control element. There would have been no need to go further. Rather, the court extensively analyzed Florida law on the question of whether stock ownership was a legal prerequisite to alter ego liability. In so doing, the court stated "[t]he theme of ownership underlies Florida's leading case on piercing the corporate veil" and it noted that the Florida Supreme Court's rationale for piercing the corporate veil was "shareholder liability." Id. (emphasis added). While the Molinas court acknowledged that the Florida Supreme Court would recognize an exception to the shareholder requirement where a spousal relationship exists, there is no indication in the Molinas decision that Florida law recognizes a broader category of relationships which would allow alter ego or veil piercing liability.

Plaintiffs fare no better under Virgin Islands law. Indeed, the case upon which Plaintiffs rely, Matheson v. Virgin Islands Comm. Bank Corp., 297 F. Supp. 2d 819, 833 (D.V.I. 2003), holds that piercing the corporate veil is appropriate where "the shareholder or officer is doing business in his or her individual capacity without regard to corporate formality." Plaintiffs have not alleged that Ramo is a shareholder or officer of Websta.

Even putting these deficiencies aside, there is another defect in Plaintiff's theory of pursuing alter ego liability. In pleading that Ramo is an alter ego of Websta, the complaints state that Mosler, through Ramo, acted as a general partner, principal or joint venturer. (FAC ¶ 18; SAC ¶ 19.) These legal relationships - general partnership, principal/agency, and joint venture -

are inconsistent with the legal concept of alter ego.  As previously discussed, an alter ego theory of liability involves disregarding the separate corporate existence of one legal entity because it, in effect, does not have a legal existence separate and apart from its controlling shareholder. Molinas, 633 F.3d at 1349 ("the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation")(emphasis in the original); Dania Jai-Alai Palace, Inc. v. Sykes, 450 So. 2d 1114, 1117 (Fla. 1984); Matheson, 297 F. Supp. 2d at 833. In contrast, the legal relationships of general partnership, principal and agent, and joint venture, all involve separate and distinct functioning individuals or entities operating together, not one individual or entity subsuming the existence of another. See, e.g., Nautica Intern., Inc. v. Intermarine USA, LP, 5 F. Supp. 2d 1333, 1342  (S.D. Fla. 1998) (Florida partnership law); Beach Community Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190, (11th Cir. 2011) (Florida requirements of principal and agent relationship); Jackson-Shaw Co. v. Jacksonville Aviation Authority, 8 So. 3d 1076, 1089 (Fla. 2008) (Florida requirements of a joint venture); Guerrero v. Bluebeard's Castle Hotel, Inc., 982 F. Supp. 343, 349 n.5 (D.V.I. 1997) (Virgin Islands requirements of a joint venture and partnership); Wilcox v. St. Croix Labor Union Mut. Homes, Inc., 567 F. Supp. 924, 935 (D.V.I. 1983) (Virgin Islands requirements for a principal and agenct relationship).  For this reason, the Court does not believe it appropriate to extend the reach of alter ego liability to encompass the legal relationships of general partnership, principal and agent, and joint venture.

Finally, the Clapp Plaintiffs have not adequately alleged that Ramo's formation or use of Websta was for an improper purpose which caused injury to Plaintiffs.  Instead, the Clapp Plaintiffs allege that Mosler, and not Ramo, used the corporate entities for an improper and

fraudulent purpose. (SAC ¶ 17; compare FAC ¶ 15.[2]) The Clapp Plaintiffs must amend to correct this pleading deficiency.

The Court rejects Ramo's contention that the Turner Plaintiffs did not sufficiently allege causation because the improper divestiture of assets took place after the deaths of decedents and therefore could not have caused the injuries Plaintiffs suffered. To be sure, under Florida law, it is necessary to show causation between the improper use of the corporate form and the plaintiff's injuries. See Gasparini v. Pordomingo, 972 So.2d 1053, 1055 (Fla. Dist. Ct. App. 2008); Seminole Boatyard, Inc. v. Christoph, 715 So.2d 987, 990 (Fla. Dist. Ct. App. 1998). The causation requirement, however, addresses whether the improper acts by the alleged alter ego caused the corporate entity to become unable to satisfy a monetary judgment. See McCormack v. Ribbeck, 702 So. 2d 271, 272 (1997) (finding that a transfer of property by the sole shareholder of the corporate employer after an employee was injured was relevant evidence on the question of whether misconduct took place to justify piercing the corporate veil); see also Bodenhamer Bldg. Corp. v. Architectural Research Corp., 873 F.2d 109, 112 (6th Cir. 1989) (injury shown when employees of parent corporation intended to prevent the plaintiff from collecting its judgment by using a "fraudulent shell game"); East Market Street Square, Inc. v. Tycorp Pizza IV, Inc., 625 S.E. 2d 191, 639-40 (N.C. Ct. App. 2006) (proximate cause established over sole shareholder's control of corporate tenant when commercial landlord sued the corporate tenant whose actions resulted in loss of rental income and demolition of building); Real Estate

---

[2] The Court notes that by alleging Ramo used the corporate entities for an improper and fraudulent purpose and promptly divested Websta's assets following the events at issue, thereby rendering Websta incapable of satisfying any judgment, the Turner Plaintiffs have satisfied the pleading requirements.

Investors Four, Inc. v. Am. Design Group Inc., 46 S.W.3d 51, 58-59 (Mo. Ct. App. 2001) ("When the action of the dominant corporation renders the subservient corporation insolvent, the requisite injury and causal connection is established."); Longo Constr., Inc. v. ASAP Tech. Svc., Inc., 748 N.E. 2d 1164 (Ohio. Ct. App. 2000) (when the principal of a corporation took a $500,000 payment received by the corporation and paid his wife instead of subcontractor hired to do construction work, the causation element was established).

For the foregoing reasons, the Complaints are dismissed. The Court will, however, give Plaintiffs leave to amend the complaints if they can do so consistent with this ruling.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Ramo's Motion to Dismiss First Amended Complaint (DE 150) and Ramo's Motion to Dismiss Count I and II and/or Strike All Alter Ego and Mere Instrumentality Allegations from the Second Amended Complaint (DE 186) are **GRANTED**. Plaintiffs are granted leave to amend their complaints **within 20 days of the date of entry of this Order.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 22nd day of April, 2013.

_____
KENNETH A. MARRA
United States District Judge