UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-md-02246-KAM

IN RE: AIR CRASH NEAR RIO GRANDE
PUERTO RICO ON DECEMBER 3, 2008

THIS DOCUMENT RELATES TO:

ALL ACTIONS
_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendant Warren Mosler's Motion to Dismiss First

Amended Complaint, or, Alternatively, to Strike (DE 149) and Motion to Dismiss Second

Amended Complaint, or, Alternatively, to Strike (DE 185).  The motions are fully briefed and

ripe for review.  The Court held oral argument on the motions on February 5, 2013.  The Court

has carefully considered the motion and the arguments of the parties and is otherwise fully

advised in the premises.

I.  Background

Plaintiffs' Complaints

Plaintiffs make the following jurisdictional allegations in their complaints:

Defendant Mosler was and is an owner, officer and/or director of Ramo with direct legal and
actual control over every aspect of Ramo's business activities, including but not limited to
the activities at issue in this action, and was engaged in substantial and not isolated activity
in the State of Florida sufficient to subject him to the general personal jurisdiction of this
Court under § 48.193(2), Fla. Stat. and meets the continuous and systematic contact
requirement for general jurisdiction under the Fourteenth Amendment of the Constitution of
the United States.

(Second Am. Compl. ¶ 12 ("SAC"), DE 173; First Am. Compl. ¶ 10 ("FAC"), DE 128.)  In

addition, the complaints state that Ramo is a Florida limited liability corporation registered to do

business in the state of Florida. (SAC ¶ 11; FAC ¶ 9.)

<u>Defendant Warren Mosler's Evidence</u>

Defendant Warren Mosler ("Mosler") is a resident and domiciliary of St. Croix, United States Virgin Islands and has been since 2003. (June 26, 2012 Am. Decl. of Mosler ¶ 2, DE 149-1.)[1] In his individual capacity, Mosler does not own or lease any real or personal property in Florida, other than some bicycles and miscellaneous items in storage, and has not done so since January 12, 2009. (<u>Id.</u> at ¶ 4(a)-(b).)  Nor does he have any personal investments of any type in Florida since October 14, 2008 when they were transferred into a trust. (<u>Id.</u> at ¶ 4(c).)  Mosler does not conduct business in Florida. (<u>Id.</u> at ¶ 4(d).)  He received insubstantial amounts of net rental income from real property located in Florida from 2003 until they were transferred into a trust by, at the latest, January 12, 2009. (<u>Id.</u> at ¶ ¶ 4(c), 4(e).)  Mosler does not maintain an agent for transacting business in the State of Florida. (<u>Id.</u> at ¶ 4(f).).  He has not bought or sold any assets in Florida since 2003. (<u>Id.</u> at ¶ 4(g).) Mosler does not have and has not had any employees in Florida. (<u>Id.</u> at ¶ 4(h).).  He has not filed tax returns with Florida since 1999. (<u>Id.</u> at ¶ 4(i).)

Websta Aviation Services, Inc. ("Websta") was incorporated on May 31, 2002 in the United States Virgin Islands with a principal place of business in St. Croix, United States Virgin Islands. (Articles of Incorporation, DE 149-2.)  Websta was the owner and operator of an airplane that crashed while in flight on December 3, 2009 in Rio Grande, Puerto Rico. (Findings of Fact at 1-4, DE 140 in case no. 09-cv-81609.)  Ken Webster, Websta's president, piloted the aircraft. (SAC ¶ 12.)  After the crash, on December 19, 2008, Websta transferred five Westwind jets to Ramo. (Findings of Fact at 4; SAC ¶ ¶ 2, 17.)

_____

[1] Unless otherwise indicated, all docket entries refer to case no. 11-md-2246.

Neither Ramo nor Mosler was in any partnership with Websta. (September 1, 2010 Mosler Aff. ¶ 6, DE 149-3; Mosler Aff. in Individual Capacity ¶ 187, DE 185-5.[2])  Neither Ramo nor Mosler entered into a contract with the passengers of the accident flight as a principal. (Mar. 15, 2012 Mosler Aff. ¶ ¶ 62-63, DE 149-4; Mosler Aff. in Individual Capacity ¶ ¶ 6, 8-12, 30, 33-34, 60-61, 82-83, 133-34, 181-82.)  Neither Ramo nor Mosler profited from any contract for the seating of passengers or selling of passenger space on the accident aircraft.  (Mar. 15, 2012 Mosler Aff. ¶ ¶ 41-42, 183, 185; Mosler Aff. in Individual Capacity ¶ 39-40, 84-85, 181-83.) Neither Ramo nor Mosler authorized Websta or its president to perform carriage of decedents Kent W. Clapp or Tracy Turner on the accident flight or in any capacity in connection with the accident flight. (Mar. 15, 2012 Mosler Aff. ¶ ¶ 19-23; Mosler Aff. in Individual Capacity ¶ ¶ 17-29,) Neither Webster nor its president performed the carriage of passengers of the accident flight by virtue of any authority from Ramo or Mosler. (Mar. 15, 2012 Mosler Aff. ¶ ¶ 28-31; Mosler Aff. in Individual Capacity ¶ ¶ 17-29.)  Neither Ramo nor Mosler contracted with Websta or its president to provide carriage, passenger aircraft or crew for the accident flight or to operate the aircraft. (Mar. 15, 2012 Mosler Aff. ¶ ¶ 32-34, 58-59;  Mosler Aff. in Individual Capacity ¶ ¶ 6, 8, 30-34, 39-40, 47-49, 74-77, 84-87, 184-86.)  Neither Ramo nor Mosler ever managed the aircraft. (Mar. 15, 2012 Mosler Aff. ¶ 53; Mosler Aff. in Individual Capacity ¶ 50.)

        Plaintiffs' Evidence

For 15 years, Mosler has been a member of the board of directors and 75 percent shareholder of Enterprise Bank of Florida, a national bank headquartered in North Palm Beach, Florida. (Mosler Dep. 14-17, DE 213-10, 11, 12, 13, 14.)  For the past eight years, Mosler has

_____

[2] This affidavit is not dated.

maintained bank accounts with the institution and, as of the date of his deposition on June 27, 2012, he was personally indebted to the bank in the range of $3,000,000.00 in the form of both personal loans or loans upon which he gave personal guaranties.[3] (Mosler Dep. 81-83.)  Mosler has sought and received seven-figure revolving lines of credit from Enterprise Bank for both business and personal purposes. (Mosler Dep. 265-69; Feb. 10, 2010 promissory note, Feb. 17, 2009 promissory note, Feb. 14, 2007 promissory note, Mar. 6, 2008 promissory note, Exs. 34-37, attached  to Mosler Dep.)   Mosler also entered into successive commercial credit arrangements with Enterprise Bank in which he pledged Florida real estate as collateral. (Mosler Dep. 93-96; Oct. 23, 2007 revolving mortgage note, Ex.10, attached to Mosler Dep.; Apr. 29, 2008 future advance revolving mortgage note, Ex. 12, attached to Mosler Dep.; Sept. 19, 2008 loan participation certificate and agreement, Ex. 15, attached to Mosler Dep.)

Mosler has also entered into a commercial arrangement with Enterprise Bank in which he borrowed money from the bank for the purpose of purchasing Florida properties of which the bank had taken possession through the foreclosure process (known as "REO properties") while pledging the same properties as collateral for the loan. (Mosler Dep. 84-85; Aug. 16, 2007 credit memorandum, Ex. 8, attached to Mosler Dep.)

Mosler owned numerous properties in Florida in his own name and, after the date of the aircrash, transferred those properties to trusts by warranty deeds. (Quitclaim deeds and related documents, Ex. A, DE 213-1.)  He derives income from residential and commercial properties in Florida.  (Aug. 10, 2012 letter from Hector R. Rivera to Jamie R. Lebovitz, Ex. B, DE 212-2;

---

[3] In Mosler's reply memorandum, he points out that he holds only one account with Enterprise bank "personally."  (Mosler Dep. 82.)

Account Quick Report Jan. 1, 2004-July 16, 2012, Ex. C, DE 213-3.)   These properties (located

in Palm Beach, Martin and Seminole counties) have generated $1,993,165.85 in rental income

over the past nine years and include Mosler's residence on Singer Island, which he currently rents

and has generated $101,625.00 in rental revenues[4]. (Mosler Dep. 17-18; Rent for Singer Island,

Account Quick Loan Report.)   Personal checking account records from December 2009 through

June 2010 show that Mosler expended approximately $78,000.00 on property fees and

maintenance related to these properties.[5] (Mosler Dep. 208-09, 222-27, 231-36, 238-42; Checks,

Exs. 22-29, DE 213-13.)

Mosler, either personally or through his trust, is the sole or majority shareholder in

several business entities formed and existing under the law of the State of Florida. (Mosler Dep.

62-63; Schedule A-2, Mosler Revocable Trust, DE 213-11.)  Section 1.04 of the Warren B.

Mosler Revocable Trust states, "During my lifetime, I shall retain the powers set forth in this

Section in addition to my powers that I reserve in other provisions of this agreement." (Section

1.04, Mosler Revocable Trust.)  The trust was formed for estate planning purposes. (Mosler Dep.

---

[4] Mosler contends that part of this rental income includes rent for a property that is leased to his elderly aunt. (Mosler Dep. 218-19.)  In addition, Mosler contends that the inclusion of 2012 rents cannot be used because, without information regarding his gross income for 2012, there is no way to determine whether rents were a significant portion of his revenue. Mosler also points out that three of these properties stopped generating rent before the date of the airplane crash, thus there were only 5 Florida investment properties generating rents. (Account Quick Loan Report.)  For that reason, Mosler contests Plaintiffs' nine-year rental figure and instead provides a figure of $1,562,741.40 for the past eight years which he states is less than 1% of his total gross income between 2004 through 2009. Mosler also states that four of his properties, which are owned by a company that was transferred into his revocable trust, have operated at a total net loss of $235,115 from 2005 through 2009. (Mosler Supp. Aff. ¶¶ 2, 5, DE 206-1.)

[5] Mosler testified that he uses someone in St. Croix to oversee the management of these properties. (Mosler Dep. 36-37.)

54.)  Mosler is the Grantor and Trustee of the Trust. (Section 3.03 and Signature Page, Mosler

Revocable Trust.)

Mosler granted a durable power of attorney to Alan Richard Simon, a Florida lawyer who

acted as Mosler's counsel with respect to his business. (Mosler Dep. 78-79; Jan. 25, 2008 durable

power of attorney, Ex. 6, DE 213-11.)  Mosler also gave Simon a durable power of attorney in

his capacity as trustee of the revocable trust. (Mosler Dep. 78-79; Oct. 14, 2008 durable power of

attorney as trustee of revocable trust, Ex. 7, DE 213-12.)   Neither power of attorney was ever

revoked.  (Mosler Dep. 78-81.)  The durable power of attorney empowered Simon to: (a) buy,

lease and sell real estate; (b) to buy, sell, ship and store personal property; (c) to engage in

business transactions, including the purchase and sale of stocks, bonds and other investments; (d)

to perform bank transactions and incur indebtedness; (e) to file and pay taxes; (f) make personal

transactions and gifts and (g) engage in legal proceedings and employ agents, employees and

counsel. (Jan. 25, 2008 durable power of attorney.)

In addition, Simon acted as Mosler's attorney in fact with respect to commercial loan

transactions with Enterprise Bank. (Oct. 23, 2007 revolving mortgage note; Apr. 29, 2008 future

advance revolving mortgage note; Sept. 19, 2008 loan participation certificate and agreement.)

Mosler testified that Simon's authority was "limited by what I told him to do."[6] (Mosler Dep.

196.)

Mosler moves to dismiss the complaints based on lack of personal jurisdiction.

Specifically, he argues that Plaintiffs have not met their pleading burden and he has provided

evidence that he has not been a resident of Florida for five years and his remaining contacts with

---

[6] Mosler testified that Mr. Simon moved to Georgia in 2009. (Mosler Dep. 80.)

Florida in his individual capacity are insufficient to establish general personal jurisdiction.

Alternatively, Mosler moves to strike the allegations in the complaints pertaining to alter ego

allegations, count II and certain paragraphs of the complaint.

Plaintiffs respond that the evidence submitted shows that Mosler has maintained

continuous and systematic business contacts in Florida for pecuniary gain.

II.  Legal Standard

The plaintiff's burden in alleging personal jurisdiction requires that the plaintiff establish

a prima facie case of personal jurisdiction over a nonresident defendant.  A prima facie case is

established if the plaintiff presents enough evidence to withstand a motion for directed verdict.

The district court must accept the facts alleged in the complaint as true, to the extent they are

uncontroverted by the defendant's affidavits.  If by defendant's affidavits or other competent

evidence, defendant sustains the burden of challenging plaintiff's allegations, the plaintiff must

substantiate the jurisdictional allegations in the complaint by affidavits, testimony or documents.

However, where the evidence conflicts, the district court must construe all reasonable inferences

in favor of the plaintiff.  See Future Tech. Today, Inc., v. OSF Healthcare Sys., 218 F.3d 1247,

1249 (11th Cir. 2000); Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 255 (11th Cir. 1996)

(citing Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990)).

In order for a court to exercise general jurisdiction in Florida, the contacts must be

especially pervasive and substantial to satisfy section two of the Florida long-arm statute 48.193.

General Cigar Holdings, Inc. v. Altadis S.A., 205 F. Supp. 2d 1335, 1343 (S.D. Fla. 2002); see

Florida Statutes.§ 48.193(2).  The general jurisdiction provision of the statute states:

A defendant who is engaged in substantial and not isolated activity within this

7

state, whether such activity is wholly interstate, intrastate, or otherwise, is subject
to the jurisdiction of the courts of this state, whether or not the claim arises from
that activity.

Id.  General jurisdiction arises from a defendant's contacts with Florida that are not directly

related to the cause of action being litigated and connexity between a defendant's activities and

the cause of action is not required.  Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286,

1292 (11th Cir. 2000). The "substantial and not isolated activity" requirement of the long-arm

statute has been recognized by Florida courts as the functional equivalent of the continuous and

systematic contact requirement for general jurisdiction under the Fourteenth Amendment Due

Process Clause as discussed in Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408,

413-416 (1984); see Woods v. Nova Cos. Belize, Ltd., 739 So.2d 617, 620 (Fla. Dist. Ct. App.

1999); Achievers Unlimited, Inc. v. Nutri Herb, Inc., 710 So.2d 716, 720 (Fla. Dist. Ct. App.

1998).  A finding that a defendant's activities satisfy section 48.193(2)'s requirements also

necessitates a finding that minimum contacts exist.  See Universal Carribean Estab. v. Bard, 543

So.2d 447, 448 (Fla. Dist. Ct. App. 1989).  Therefore, the analysis of jurisdiction under section

48.193(2) and the Due Process clause merge.

As there is no requirement of a connection between the defendant's activities and the

cause of action, the Due Process requirements are much more stringent for general personal

jurisdiction than for specific personal jurisdiction.  Due Process requires a showing of

substantial, persistent, continuous, and systematic business contacts between the defendant and

the forum state.  Helicopteros, 446 U.S. at 414 nn.8, 9; Ruiz de Molina v. Merritt & Furman Ins.

Agency, Inc., 207 F.3d 1351, 1357 n.4 (11th Cir. 2000);  Meier v. Sun International Hotels, Ltd.,

288 F.3d 1264, 1274 (11ᵗʰ Cir. 2002); Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055, 1057 (11ᵗʰ Cir. 1986).  "The substantial connection between a defendant and the forum state must come about by an action of the defendant purposefully directed toward the forum state."  Nida Corp. v. Nida, 118 F. Supp. 2d 1223, 1229 (M.D. Fla. 2000) (citing Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty., 480 U.S. 102, 108-09 (1987)).  The defendant's contacts "must be so extensive to be tantamount to [a defendant] being constructively present in the state to such a degree that it would be fundamentally fair to require it to answer in [the forum state's courts] in any litigation arising out of any transaction or occurrence taking place anywhere in the world."  Baker v. Carnival Corp., No. 06-21527-CIV-HUCK, 2006 WL 3360418, at * 2 (S.D. Fla. Nov. 20, 2006) (citing Purdue Research Foundation v. Sanofi Synthelabo, S.A., 338 F.3d 773, 787 (7ᵗʰ Cir. 2003)).

III. Discussion

After careful review of the evidence, the Court finds that Plaintiffs have established that Mosler possesses the type of systematic business contacts between him and Florida that permits this Court to exercise personal jurisdiction over him.  Significantly, Mosler holds bank accounts at a Florida bank for which he is a director and shareholder, has taken out loans and personal guarantees from that bank in excess of $3,000,000, arranged for seven-figure lines of credit from the bank for both business and personal purposes, has pledged to the bank Florida real estate as collateral, borrowed money from the bank to purchase distressed real estate, owned numerous rental properties in Florida in his name and is the trustee of a revocable trust that holds the title to numerous rental properties in Florida, spends money in Florida to pay for management and maintenance of the Florida properties and provided a Florida attorney with a power of attorney to

handle some of his business affairs. These varied activities, taken collectively, show that Mosler has a substantial connection with Florida.[7]

Indeed, Florida courts have found that general jurisdiction was established when a defendant was actively involved in the management of real estate in Florida, corresponded with local municipalities about development of those properties and retained a Florida realtor to locate the property and negotiate terms for its purchase. See Gahn v. Holiday Property Bond, Ltd., 826 So. 2d 423, 427 (Fla. Dist. Ct. App. 2002). Here, there is ample evidence about Mosler's real estate transactions in Florida. Regardless of whether the real estate at issue is owned in Mosler's individual name or titled in a revocable trust, the properties constitute a substantial connection with Florida.[8] See Engelke v. Estate of Engelke, 921 So. 2d 693, 696 (Fla. Dist. Ct. App. 2006) (finding that because the decedent's residence was held in a revocable trust, and the decedent retained a right of revocation, the decedent maintained an ownership interest in his residence, even though the revocable trust held title to the property). Furthermore, Mosler's extensive banking relationship for a period of years with a Florida bank also constitutes conducting business in the state of Florida. See Autonation, Inc. v. Whitlock, 276 F. Supp. 2d 1258 (S.D. Fla. 2003) (general jurisdiction established when, over a period of five years, the defendant attended six business meetings in Florida and had ongoing contacts with the Florida plaintiff via communications of customer complaints and engaged in the transmission of business

---

[7] The Court finds that this evidence rebuts Mosler's evidence that he does not own or lease real property in Florida or conducts business in Florida.

[8] Nor does it matter that the transfer of these properties into the trust began in 2003 and continued into 2009. "Contacts are commonly assessed over a period of years prior to the plaintiff's filing of the complaint." Woods, 739 So. 2d at 621; see also Helicopteros, 466 U.S. at 409-411 (examining contacts over a seven-year-period, up to the time the lawsuit was filed).

information); Achievers Unlimited, Inc. v. Nutri Herb, Inc., 710 So.2d 716, 720 (Fla. Dist. Ct. App.1998) (three-year distribution relationship with a Florida corporation establishes general jurisdiction).   Lastly, Mosler engaged in substantial business activities in Florida by granting Mr. Simon, a Florida lawyer, a power of attorney to act for him in Florida, at least in part on business related matters through 2009.  See Resolution Trust Corp. v. Pharaon, 915 F. Supp. 351, 355, 359 (S.D. Fla. 1996) (personal jurisdiction found appropriate over a defendant who, along with his agent who was given power of attorney, engaged in frequent communications and visits with Florida residents for the purpose of purchasing and selling stock); Oldock v. DL & B Enterprises, Inc., 100 So. 3d 50, 53 (Fla. Dist. Ct. App. 2011) ( "a nonresident defendant who engages the services of brokers, jobbers, wholesalers, or distributors can be subject to jurisdiction if the defendant was engaged in a course of conduct in Florida for the purpose of realizing a pecuniary benefit."); American Fin.  Trading Corp. v. Bauer, 828 So. 2d 1071, 1074 (Fla. Dist. Ct.  App. 2002) (same and applied to a Texas resident who used Florida-based brokerage to trade commodities).

The Court will now turn to the determination of whether jurisdiction over Mosler is consistent with fair play.  The factors to decide whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" are: 1) the burden on the defendant in defending the lawsuit; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and 5) the shared interest of the states in furthering fundamental substantive social policies.  Exhibit Icons, LLC v. XP Cos., LLC, 609 F. Supp. 2d 1282, 1294 (S.D. Fla. 2009) (citing Cronin v. Washington Nat. Ins. Co.,

980 F.2d 663, 671 (11th Cir. 1993)).

The Court finds that these elements are met. Given that the case against Mosler is part of the multi-district litigation that has been assigned to this Court, Florida has an interest in adjudicating this dispute. Furthermore, Plaintiffs have sued numerous Defendants, over whom the Court can also assert personal jurisdiction, and it is in the interstate judicial system's interest to litigate this case in one forum. Lastly, "modern transportation and communication have made it much less burdensome" for an out-of-state Defendant to be sued in another state. Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 858 (citations omitted). As such, personal jurisdiction can be exercised over Mosler.

Mosler's protestations to the contrary can be easily dismissed. Many of Mosler's arguments rely on cases in which the courts found there was no personal jurisdiction based on *one* connection with the state of Florida. For example, Mosler cites to Newberry v. Rife, 675 So. 2d 684, 685 (Fla. Dist. Ct. App. 1996) where the only record support for personal jurisdiction over the defendant was her status as shareholder and director of a Florida corporation. Here, Mosler has a myriad of contacts and Plaintiffs are not just relying on his roles on the Florida bank's board of directors and 75 percent shareholder. See Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino, 447 F.3d 1357, 1361 (11th Cir. 2006) (citing Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996) (to determine whether a defendant was engaged in substantial and not isolated activity, *their actions must be considered collectively* and show a general course of business activity in the State for pecuniary benefit) (emphasis added) (internal quotation marks omitted). The same can be said about Mosler's reliance on La Reunion Francaise v. La Constena, 818 So. 2d 657, 659 (Fla. Dist. Ct. App. 2002)

12

(finding insufficient minimum contacts when the only connection to Florida is the maintenance

of a Florida bank account), Holton v. Prosperity Bank of St. Augustine, 602 So. 2d 659, 662-63

(Fla. Dist. Ct. App. 1992) (guarantor's mere obligation to honor a payment of another even if the

obligation is made in Florida is not a substantial activity) and Nichols v. Paulucci, 652 So. 2d

389, 392 n. 5 (Fla. Dist. Ct. App. 1995) ("By itself, ownership of property is insufficient to

subject a nonresident defendant to the jurisdiction of the courts of this state, unless the cause of

action arose out of such ownership.")

Next, the Court turns to Mosler's argument that only a *de minimis* percentage of his total

gross revenue was derived from Florida rental property. Mosler states that, regardless of whether

Court accepts his figures or Plaintiffs, at best the total gross rent he earned represents less than

1% of his total gross income between 2004 and 2009 and thus cannot support a finding of

personal jurisdiction. Although Molser cites to numerous cases (DE 206 at 9-10) in support,

those cases all concern defendants that have little to no contacts with Florida other than the

generation of a *de minimus* revenue. As the evidence makes clear, Mosler's contacts with

Florida are varied and extensive.

Equally unpersuasive is Mosler's argument that he does not engage in activities for his

pecuniary benefit. Instead, he claims that he has incurred a pecuniary burden of making

repayments of debts in the state of Florida. In determining whether a Florida court has

jurisdiction over a defendant, courts do not look to whether a business is successful. Instead,

courts look to factors such as the presence and operation of an office in Florida, the possession

and maintenance of a license to do business in Florida, whether a substantial number of Florida

clients are served and whether a large percentage of overall revenue is gleaned from Florida

13

clients. <u>Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.</u>, 421 F.3d 1162, 1166 (11th

Cir. 2005).[8] Mosler's banking activities at a Florida bank are substantial.

Lastly, the Court rejects Mosler's contention that by transferring his Florida real estate to

a trust, he does not own or lease Florida properties and hence his activities with respect to those

properties cannot be used in determining personal jurisdiction. First, as indicated previously, the

fact that these properties are now held in a trust that Mosler created for his benefit and for which

he is the trustee does not insulate him from the activities of the trust. <u>See</u> <u>Engelke v. Estate of</u>

<u>Engelke</u>, 921 So. 2d 693, 696 (Fla. Dist. Ct. App. 2006) (finding that because the decedent's

residence was held in a revocable trust, and the decedent retained a right of revocation, the

decedent maintained an ownership interest in his residence, even though the revocable trust held

title to the property). Moreover, Mosler acknowledges that the transfer of these properties to the

trust began in 2003 and the last property was transferred around January 12, 2009. (DE 206 at 14

n.14; June 26, 2012 Am. Decl. of Mosler ¶ 4(a), 4(e).) The airplane crash occurred on December

19, 2008 and the complaints were filed in December of 2010. Therefore, regardless of whether

the properties are now titled to the trust, his previous ownership of the properties is relevant for

personal jurisdiction purposes.[10] <u>See</u> <u>Woods</u>, 739 So. 2d at 621 ("Contacts are commonly

assessed over a period of years prior to the plaintiff's filing of the complaint.")

For the foregoing reasons, the Court denies the motion to dismiss for lack of personal

---

[8] These factors are "relevant[ ] but not dispositive." <u>Id.</u>

[10] <u>See</u> <u>supra</u> the court's discussion of <u>Engelke</u>, 921 So. 2d at 696 at p. 10.

jurisdiction.[11]

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Warren

Mosler's Motion to Dismiss (DE 149 and 185) are **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 24th day of June, 2013.

KENNETH A. MARRA
United States District Judge

---

[11] The Court also rejects Mosler's arguments about alter ego and the instrumentality allegations relating to Websta in the complaints. These arguments go to the merits of the case and do not shed any light on personal jurisdiction over Mosler. The Court also denies the motion to strike on the same basis.