UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-md-02246-KAM

IN RE: AIR CRASH NEAR RIO GRANDE
PUERTO RICO ON DECEMBER 3, 2008

THIS DOCUMENT RELATES TO:

CASE NO.     10-cv-81551
             11-cv-80059
_____/

**OPINION AND ORDER**[1]

This cause is before the Court upon Warren Mosler's Motion to Dismiss Alexander Kent Clapp and Jason Clapp's Third Amended Complaint (DE 304) and Warren Mosler's Motion to Dismiss J. Donald Cairn's Second Amended Complaint (DE 305). The Court has carefully considered the Motions and is otherwise fully advised in the premises.

I.  Background

Plaintiff J. Donald Cairns, as personal representative of the Estate of Tracy Turner, (the "Turner Plaintiff") brings this Second Amended Complaint ("SAC") and Plaintiffs Alexander Kent Clapp and Jason Clapp, as personal representatives of the Estate of Kent W. Clapp, (the "Clapp Plaintiffs") (collectively, "Plaintiffs") bring this Third Amended Complaint ("TAC") against Defendants Websta's Aviation Services, Inc. ("Websta's"), Ramo, LLC ("Ramo") and Warren Mosler ("Mosler") (collectively, "Defendants"), asserting a claim pursuant to the Montreal Convention for the Unification of Certain Rules for International Carriage by Air, ICAO Doc. 9740, reprinted in Treaty Doc. No. 106–45, 1999 WL 33292734 (2000), ("Montreal Convention" or "the Convention") (count one of SAC and TAC), a claim for alter ego liability

---

[1] The Court presumes familiarity with its prior Orders.

against Mosler (count two of SAC and TAC), a claim for joint venture liability against Websta's and Mosler (count three of SAC and TAC), a fraudulent transfer claim against Mosler (count four of SAC, count six of TAC), a fraudulent transfer by implication claim against Mosler (count five of SAC, count seven of TAC),[2] a fraudulent transfer per se claim against Ramo (count four of TAC) and a fraudulent transfer by implication claim against Ramo (count five of TAC). (SAC, DE 291; TAC, 290.) (collectively, "Complaints").

According to the Complaints, Tracy Turner and Kent W. Clapp were passengers aboard a chartered flight operated by Defendants and piloted by Websta's president. The aircraft crashed into a mountain near Rio Grande, Puerto Rico while en route from Terrance B. Lettersome International Airport in Tortola, British V.I. to Luis Munoz Marin International Airport in San Juan, Puerto Rico. As a result of the crash, Ms. Turner, Mr. Clapp and the pilot were all killed. (SAC ¶¶ 21-22; TAC ¶¶ 20-21.) It is further alleged that Websta's and Mosler were responsible for the safe and proper maintenance of the aircraft, for the safe and proper equipping of the aircraft during its flight, and for the proper training, currency, and rest requirements of the flight crew. (SAC ¶ 19; TAC ¶ 18.) Additionally, Plaintiffs allege that Websta's and Mosler were the owners of the aircraft, they were the constructive owners of the aircraft, they exercised complete control and dominion over the operation, equipping and maintenance of the accident aircraft and they were the actual and constructive operators of the aircraft. (SAC ¶ 20; TAC ¶ 19.)

The flight was operated under the name Websta's, which was a "mere instrumentality and alter ego" of Mosler, who used both Websta's and Ramo in furtherance of his personal business. After the crash, Mosler used his control over Websta's and Ramo to divest Websta's of its assets.

---

[2] Count seven of the TAC is mistakenly labeled count eight.

(SAC ¶ 2; TAC ¶ 2.)  Mosler was and is the sole shareholder, officer and/or director of Ramo with legal and actual control over Ramo's business activities.  At all relevant times, Mosler was the de facto majority shareholder and primary investor in Websta's. (SAC ¶ 11; TAC ¶ 11.)  Websta's operated as a "common carrier" engaged in the business of transporting passengers and crew members to and from destinations in the Caribbean. (SAC ¶ 12; TAC ¶ 12.)  Ramo was formed for the purpose of serving as a conduit for Mosler to funnel money and resources into Websta's. (SAC ¶ 13; TAC ¶ 13.)  Ramo was the alter ego of Mosler and Mosler dominated and controlled Ramo "to such an extent that its independent existence was nonexistent, and Molser was in fact the alter ego of the corporation." (SAC ¶ 14; TAC ¶ 14.)

Mosler, through Ramo, maintained immediate control over and effective ownership of Websta's assets and operations, "such that Websta's was nothing more than Mosler's alter ego, in that Mosler, either directly or through Ramo, had effective ownership of Websta's operational assets, paid most expenses related to Websta's operations, was in every way the de facto majority shareholder and controlling officer of said business entity, and dominated and controlled the corporation to such extent that the corporation's independence was nonexistent and Mosler was in fact the alter ego of the corporation."  (SAC ¶ 15; TAC ¶ 15.)  Mosler made the majority of decisions regarding Websta's operational assets, including selecting the type of aircraft, negotiating the purchase price of aircraft, deciding to ground certain aircraft for parts, and prohibiting the sale or disposition of those aircraft without authorization.  (SAC ¶ 15(b); TAC ¶ 15(b).)  Mosler decided which pilots would fly Websta's aircraft and Mosler paid for Websta's pilots' flight training.  (SAC ¶ 15(c).)  Mosler, through Ramo, provided capital under the guise of a loan to Websta's in the amount of $4.25 million to purchase five Israel Industries Westwind

3

jets without a credit check, financial background check, or financing statement. (SAC ¶ 15(c)[3]; TAC ¶ 15(c).)  Mosler, directly and through Ramo, paid all operational, maintenance and insurance expenses relating to the Westwinds, and paid expenses relating to the accident aircraft as well. (SAC ¶ 15(d); TAC ¶ 15(d).)  Neither Websta's nor Ken Webster ever made any payments on the $4.25 million loan, nor were they required to under the terms of the loan. (SAC ¶ 15(e); TAC ¶ 15(e).)  Mosler loaned a total of $6.1 million to Websta's through Ramo, all without additional security beyond the five Westwinds, and without requiring additional promissory notes, credit checks, or any financial statements. (SAC ¶ 15(f); TAC ¶ 159f).)  Mosler established lines of credit with third parties for the benefit of Websta's and in Websta's name. (SAC ¶ 15(g).)  Websta's never generated any revenue, nor did it repay any money towards the loans. (SAC ¶ 15(h); TAC ¶ 15(g).)  Mosler was building an aircraft hanger adjacent to Websta's leased property at St. Croix airport. (SAC ¶ 15(i).)   In essence, Websta's was an alter ego of Mosler in that Mosler, acting under both his own name and under the corporate name of Ramo maintained control over substantially all of Websta's assets, directed Websta's operations and fiscal policies, cash flow, budgeting, expenditures, maintenance, operations, aircraft modifications, use of aircraft, manpower, scheduling, and Websta's day to day operations. (SAC ¶ 16; TAC ¶ 16.)

Alternatively, Websta's and Mosler, acting both directly and under the corporate name of Ramo, were engaged in a joint venture.  The purpose of the joint venture was to provide charter flight operations.  In this joint venture, Websta's and Mosler both made contributions, Websta's being services and Mosler's being capital, and over which Websta's and Mosler had a joint

---

[3] There are two paragraphs numbered 15(c).

proprietary interest and a joint right of mutual control. As a result, Websta's flight operations gave rise to mutual obligations on the part of Websta's and Mosler. (SAC ¶ 17; TAC ¶ 17.)

Mosler has used Ramo to divest Websta's of its assets following the crash. After Ramo was ordered to transfer those assets back to Websta's, Mosler caused Ramo to transfer those assets. After having declared the aircraft N518WA for purposes of his 2009 tax returns as having a depreciated value of more than $1.2 million, and the aircraft N618WA as having a depreciated value of more than $1.1 million, Mosler sold the two aircraft in May of 2011 for a total of $563,950.00. (SAC ¶ 18; TAC ¶ 18.)

In moving to dismiss, Mosler argues that the allegations of the Complaint establish that Websta's, not Mosler, was the contracting carrier and there was no actual carrier under the Montreal Convention. In addition, counts one, two and three fail to allege facts that Mosler was a carrier under the Convention. Mosler also argues that the Complaints fail to allege facts to hold Mosler liable for the acts of Websta's under an alter ego theory or joint venture theory of liability. With respect to the FUFTA claims, Mosler contends that these claims were dismissed and are now waived.

In response, Plaintiffs argue that there can be more than one carrier under the Montreal Convention and Mosler was a carrier. Alternatively, Plaintiffs argue that Mosler was Websta's alter ego and Mosler and Websta's were joint venturers. With respect to the FUFTA claims, Plaintiffs state that Mosler has misread the Court's prior rulings and those claims are adequately pled.

5

II. Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

III. Discussion

A. Claims Under the Montreal Convention

It appears to be undisputed that Websta's was a carrier subject to the provisions of the Montreal Convention and therefore can be held liable for damages stemming from the ill-fated flight. The central question presented in these motions is whether Plaintiffs have stated legally viable claims against Mosler under the Montreal Convention. Plaintiffs set forth various legal theories in support of their attempt to do so. In count one, Plaintiffs argue that there can be more than one carrier under the Montreal Convention and that both Websta's and Mosler were carriers. In count two, Plaintiffs argue that Mosler is liable because he was Websta's alter ego. In count three, Plaintiffs allege Mosler can be held liable because he was in a joint venture with Websta's.

An examination of the Montreal Convention reveals that it does not expressly address the question of whether alter ego and joint venture liability theories can be pursued under it. Plaintiffs are thus attempting to use recognized state law doctrines of imposing liability on third parties, who were not direct participants in the event or transaction, as a means of bringing Mosler within the ambit of the Convention. In determining whether such legal theories of imposing liability can be used, the Court observes that the Montreal Convention has been described by commentators as "a treaty that favors passengers rather than airlines." Ehrlich v. American Airlines, Inc., 360 F.3d 366, 371 n.4 (2d Cir. 2004). Here, if available, the state law principles sought to be applied by Plaintiffs could render Mosler liable under the Montreal Convention. Such a result would be consistent with the passenger-focused theme of the Convention. See Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991) ("treaties are construed more liberally than private agreements, and to ascertain their meaning we may look

beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.") (citations and quotation marks omitted).

The Court sees no reason to interpret the Montreal Convention so as to narrow or limit the number of responsible parties. Indeed, nothing in the Convention suggests an intent to insulate third parties from liability under legal theories that are available under the law of the appropriate forum. See, e.g., Convention, Art. 37. ("Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person."). The Court sees no justification for failing to apply legal principles that would impose liability on a responsible party if available under the law of the forum when the treaty is silent on the question. See Sampo, 522 F.3d at 781 ("An air carrier's right to a setoff or contribution from a joint tortfeasor is, similarly, incidental to the causes of action available under the Convention and therefore not subject to its limited preemption"). Thus, the Court finds that alter ego and joint venture theories of liability can be asserted under the Convention, if they are recognized under the law of the forum.[4]

B. Carrier Under the Montreal Convention

Next, the Court examines the allegations in count one surrounding "actual carrier" and "contracting carrier" under the Montreal Convention. Both complaints allege that the flight at issue was "piloted by Websta's president." (SAC ¶ 21; TAC ¶ 20.) In addition, both complaints state that Mosler is "either an actual and/or contracting carrier . . . either under the name of

---

[4] The law of the forum includes the law relative to choice of law. McMahan v. Toto, 256 F.3d 1120, 1131 (11th Cir. 2001). Here, the parties agree to apply Virgin Islands law. Mosler also seeks to apply Florida law to portions of the analysis as well. In this case, the outcome is the same regardless of whether Virgin Island or Florida law is applied.

8

Websta's or through his actual control of same; he was at all times pertinent hereto an air transport undertaking and performing international carriage by air, both gratuitously and for reward." (SAC ¶ 39; TAC ¶ 38.)

Article 17 of the Montreal Convention states, in relevant part, that "the carrier is liable for damages sustained in case of death or bodily injury of a passenger on condition only that the accident which caused the death or injury took place on board the aircraft . . . ." Article 39 of the Montreal Convention explains the meaning of the word "carrier:"

> The provisions of this Chapter apply when a person (hereinafter referred to as "the contracting carrier") as a principal makes a contract of carriage governed by this Convention with a passenger or consignor or with a person acting on behalf of the passenger or consignor, and another person (hereinafter referred to as "the actual carrier") performs, by virtue of authority from the contracting carrier, the whole or part of the carriage, but is not with respect to such part a successive carrier within the meaning of this Convention. Such authority shall be presumed in the absence of proof to the contrary.

Article 39, Montreal Convention.

The parties disagree on whether the Montreal Convention prohibits, as a matter of law, more than one "actual carrier." Mosler contends that the term "carrier" applies only to one carrier; i.e., the airline that actually transported the passengers. In contrast, Plaintiffs point to McCarthy v. American Airlines, No. 07-61016-CIV, 2008 WL 2704515 (S.D. Fla. June 27, 2008). In that case, the court addressed what constitutes a "carrier" within the meaning of the Montreal Convention. The plaintiff had sued multiple airlines after being injured. Id. at * 1. The court noted that, while under the Warsaw Convention (the Montreal Convention's predecessor), there could only be one "carrier" (i.e., the entity that actually transported passengers and baggage), the Montreal Convention distinguished between a "contracting carrier" and an "actual carrier." Id. at * 2. The "contracting carrier" makes a contract of carriage and the "actual carrier" "actually performs the carriage in whole

9

or in part, pursuant to the authority from the 'contracting carrier.'" Id.  Furthermore, the court observed that the Montreal Convention sought to address the duties and obligations of carriers engaged in "code-share operations." Id. at 3.  As such, the Montreal Convention, by including language regarding "contracting carriers" and "actual carriers," contemplated that more than one carrier could be liable to a passenger. Id.

      C. Counts 1 (Montreal Convention) and 2 (Alter Ego Liability)

In count one, Plaintiffs have alleged that Mosler and Websta's were one and the same and therefore both of them may be "either an actual and/or contracting carrier subject to the Montreal Convention." (SAC ¶ 39; TAC ¶ 39.)  Put another way, Plaintiffs claim that, when Websta's contracted to and did provide international air transport to Ms. Turner and Mr. Clapp, Mosler did so as well.  This contention, however, fails because the facts as alleged establish that Websta's was the sole contracting and actual carrier. ("Websta's agreed to provide international transport to certain passengers, including Plaintiff's decedent." SAC ¶ 37; TAC ¶ 36; the flight was "piloted by Websta's president" SAC ¶ 21; TAC ¶ 20.)  There are no allegations that Mosler contracted with the decedents or actually provided the transport.  Plaintiffs' sole legal basis for imposing liability upon Mosler under count one is an alter ego theory of liability. (See e.g., SAC ¶ 15; TAC ¶¶ 15.)  This is also the theory that Plaintiffs use as a basis for liability under count two. (Id.; SAC ¶ 46; TAC ¶ 45.)

Mosler, however, contends the Complaints fail to allege facts which will support a claim against him based upon an alter ego theory of liability.  Mosler relies on Molinos Valle Cibao v. Lama, 633 F.3d 1330 (11th Cir. 2011), which held that Florida law does not permit a plaintiff to pierce a corporate veil against a non-shareholder director.  The Complaints do not allege that Mosler

was a shareholder of Websta's, but instead allege he was a "de facto majority shareholder and controlling officer" of that entity. (SAC ¶ 15; TAC ¶ 15.) Mosler also contends that the Virgin Islands law does not permit alter ego liability under the facts pled. Plaintiffs attempt to distinguish Molinos on the basis that the plaintiff there attempted to pierce the corporate veil based solely on the allegation that the individual was a director of the corporation, whereas here there are allegations of domination and control. With respect to Virgin Islands law, Plaintiffs rely on Matheson v. Virgin Islands Comm. Bank Corp., 297 F. Supp. 2d 819, 833 (D.V.I. 2003)).

In its prior order, the Court concluded that alter ego liability was not available against a non-shareholder under either Florida or Virgin Island law. (DE 233.) The Court incorporates the reasoning and conclusions of that order for purposes of this ruling. In the absence of an express adoption by the Montreal Convention of an alter ego theory of liability, the Court will not expand the reach of the Convention to allow a claim to be brought under a theory of liability not recognized by the law of the forum, or based on facts that would not support a claim for a theory of liability recognized under the law of the forum. Under Molinos, stock ownership is a legal prerequisite to alter ego liability[5] in Florida. Id. at 1349. To pierce the corporate veil, Virgin Islands law requires that "the shareholder or officer is doing business in his or her individual capacity without regard to corporate formality." Matheson v. Virgin Islands Comm. Bank Corp., 297 F. Supp. 2d 819, 833 (D.V.I. 2003). Plaintiffs have not and cannot allege Mosler was a shareholder or officer of Websta's. (SAC ¶ 15; TAC ¶ 15.)

---

[5] With respect to Plaintiffs' continued reliance on NetJets Aviation, Inc. v. Peter Sleiman Dev. Group, LLC, No. 3:10-cv-483-J-32MCR, 2011 U.S. Dist. LEXIS 109973 (M.D. Fla. Sept. 27, 2011) ("NetJets II"), the Court rejects this for the same reasons stated in its prior Order. (DE 233.)

11

As a result of the foregoing discussion, the Court grants Mosler's motion to dismiss counts 1 and 2 of the Complaints. Because amending these claims will be futile, the dismissal of these counts is with prejudice.

D. Count 3 (Joint Venture Liability)

The Court will now address whether Mosler can be held liable as a carrier under the Montreal Convention for the acts of Websta's under a joint venture theory of liability. Because the law of the forum recognizes a joint venture theory of liability,[6] the Court concludes that a claim based on this theory can be asserted under the Montreal Convention in this case. Mosler contends, however, that the Complaints fail to allege joint venture liability under Virgin Islands law because (1) they do not allege that Websta's and Mosler carried out a single enterprise for profit or that the profits were to shared by the parties; (2) the allegations are conclusory; (3) the allegations are inconsistent because, on one hand, they allege that Websta's and Mosler had joint proprietary interests in the joint venture and, on the other hand, that Websta's transferred ownership of the jets to Ramo and those aircrafts were assets of Websta's; (4) the allegations do not indicate whether the agreement was verbal or in writing and (5) the allegations do not state when the joint venture was to terminate. (DE 304 at 13-15; DE 305 at 13-15.)

The parties agree on the requirements to establish a joint venture under Virgin Islands law:

> 1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; 2) profits must be shared among the parties; 3) there must be a joint proprietary interest and right of mutual control over the subject matter of the enterprise; and 4) usually, there is a single business transaction rather than a general and continuous transaction.

---

[6] Both the Virgin Islands and Florida recognize joint venture as a basis for imposing liability. Guerrero v. Bluebeard's Castle Hotel, Inc., 982 F. Supp. 343 (D.V. I. 1997); Jackson-Shaw Co. v. Jacksonville Aviation Authority, 8 So.3d 1076 (Fla. 2008).

Boudreaux v. Sandstone Group, No. CIV. 1014/1991, 1997 WL 289867, at * 3 (Terr. Ct. V.I. May 16, 1997). The agreement may be expressed or implied. C&C/Manhattan v. Government of Virgin Islands, No. DC CIV 2001/028, CIV. 876/1998, 2004 WL 2743554, at * 4 (D.V.I. Nov. 29, 2004).

The Complaints allege that Mosler made financial contributions to the venture (SAC ¶ 15; TAC ¶ 15) and Websta's contributed flight services (SAC ¶ 17; TAC ¶ 17). Furthermore, Mosler and Websta's had a joint proprietary interest and right of mutual control in operating an air charter service to support Mosler's business ventures (SAC ¶ 15; TAC ¶ 15). With respect to the sharing of profits, Plaintiffs point to allegations that the venture never generated any revenue. (SAC ¶15 ; TAC ¶ 15.)

The Court finds that the allegations sufficiently allege a joint venture agreement. With respect to Mosler's complaints that the claims fail to allege adequately whether the alleged joint venture was for a single business transaction or whether it was for a general and continuous transaction[7] or how profits from the venture would be distributed or apportioned, the Court finds that these elements are plead adequately and Plaintiff will need to supply proof of these elements at trial.[8]

For the foregoing reasons, the motion to dismiss count three is denied.

---

[7] The Court does not agree with Mosler that the allegations stating that he, through Ramo, loaned Websta's money and that Websta's transferred ownership of aircraft to Ramo contradicts the allegation that Websta's and Mosler had a joint proprietary interest.

[8] Mosler argues that the Court's previous findings Turner v. Ramo, LLC, case number 9:09-cv-81609-KAM contradict the joint venture allegations. While Mosler does not characterize this as a collateral estoppel argument, it is. The Court cannot make such a determination without the development of a full record.

### E. Counts four and five of SAC; Counts six and seven of TAC

Mosler moves to dismiss the fraudulent transfer claims because Plaintiffs are no longer creditors of Ramo. Specifically, Mosler claims that Plaintiffs have no right to payment from Ramo because the fraudulent transfer claims against Ramo were dismissed by the Court and Plaintiffs did not timely file an amended complaint. However, as previously discussed by the Court's June 11, 2014 Order (DE 374), Ramo never moved to dismiss those counts and the Court never dismissed the fraudulent transfer claims against Ramo.

Furthermore, a review of the fraudulent transfer claims against Mosler show they adequately state a claim. Fraudulent transfer per se requires that: (1) the creditor's claim arose prior to the transfer; (2) the transfer lacks consideration and (3) the debtor was insolvent or became insolvent as a result of the transfer. Florida Statute § 726.106(1). Here, Plaintiffs allege they cannot recover damages because Mosler transferred assets from Ramo for less than market value, despite the pendency of fraudulent transfer proceedings. (SAC ¶ ¶ 57-60; TAC ¶ ¶ 71-74.) Likewise, the fraudulent transfer by implication claim is also properly pled. The elements required are: "(1) [Plaintiffs] were creditors who were defrauded; (2) that [the defendant] intended to commit the fraud; and, (3) that the fraud involved a conveyance of property that could have been applicable to the payment of the debt due." See Dillon v. Axxsys Int'l, Inc., 185 F. App'x 823, 828-30 (11th Cir. 2006) (citing Nationsbank, N.A. v. Coastal Utilities, Inc., 814 So. 2d 1227, 1229 (Fla. Dist. Ct. App. 2002) (elements of fraudulent transfer by implication). Plaintiffs allege Molser transferred assets from Ramo for less than market value to hinder, delay or defraud Plaintiffs, whose claims for the fraudulent transfer violations were pending. (SAC ¶ ¶ 62-66; TAC ¶ ¶ 76-80.) Finally, to the extent that Mosler contends these claims cannot proceed because Plaintiffs are no longer creditors of Ramo

because there are no wrongful death claims pending against Ramo, the Court disagrees. Plaintiffs have fraudulent transfer claims and a judgment against Ramo.

For these reasons, the motions to dismiss the fraudulent transfer claims against Mosler are denied.

### IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) Warren Mosler's Motion to Dismiss Alexander Kent Clapp and Jason Clapp's Third Amended Complaint (DE 304) is **GRANTED IN PART AND DENIED IN PART**.

2) Warren Mosler's Motion to Dismiss J. Donald Cairn's Second Amended Complaint (DE 305) is **GRANTED IN PART AND DENIED IN PART**.

3) Plaintiffs shall file Amended Complaints **within 14 days of the date of entry of this Order.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 23rd day of January, 2015.

_____
KENNETH A. MARRA
United States District Judge